WORKMAN v DETROIT AUTOMOBILE INTER-INSURANCE
EXCHANGE

Docket No. 58106. Argued March 3, 1977 (Calendar No. 12).—Decided
January 4, 1979.

Deborah L. Workman brought a complaint against Detroit Auto-
mobile Inter-Insurance Exchange, Wolverine Insurance Com-
pany, and Community Services Insurance Company to recover
no-fault insurance benefits arising out of an automobile acci-
dent. Plaintiff was a passenger in an automobile owned and
operated by her sister; as a result of a one-car accident she is a
paraplegic confined to a wheelchair. Neither the plaintiff nor
her husband owned an automobile, and the purpose of this suit
was to determine which insurer was liable. The Kent Circuit
Court, Stuart Hoffius, J., granted summary judgment for
Wolverine Insurance Company, which insured plaintiff's
mother; found Community Services, which insured plaintiff's
father-in-law, liable because plaintiff was domiciled in his house-
hold; and granted judgment for DAIIE, which insured the
owner of the automobile involved in the accident, the plaintiff's
sister. The trial court also found the liability of Community
Services was not reduced by Medicaid payments for medical
services, and held the provision of the no-fault insurance act
(1972 PA 294) which gives the carrier credit for the plaintiff's

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 14, 15] New Topic Service Am Jur 2d, No-Fault Insurance § 18.
[2-4] 43 Am Jur 2d, Insurance § 315.
    44 Am Jur 2d, Insurance § 1408.
    Who is member of insured's "family" or "household" within cover-
    age of property insurance policy. 1 ALR2d 561.
    Who is "relative" or "member" or "resident" of same family or
    household, within liability insurance provision defining additional
    insureds. 78 ALR2d 1404.
[6, 7] New Topic Service Am Jur 2d, No-Fault Insurance §§ 22, 27.
[8, 9] 73 Am Jur 2d, Statutes §§ 145, 146.
[10] 73 Am Jur 2d, Statutes §§ 103, 123.
[11] New Topic Service Am Jur 2d, No-Fault Insurance §§ 14, 15.
[12, 17] New Topic Service Am Jur 2d, No-Fault Insurance § 9.
[13] New Topic Service Am Jur 2d, No-Fault Insurance § 8.
[16] 73 Am Jur 2d, Statutes § 236.

recovery of tort damages unconstitutional. Plaintiff and Community Services Insurance Company appeal prior to decision by the Court of Appeals. *Held:*

1. Plaintiff was a relative and "domiciled in the same household" as her father-in-law; therefore defendant Community Services is liable to plaintiff for the no-fault insurance benefits. Community Services conceded in its brief that as a matter of law plaintiff was a relative of their insured. Although the no-fault act uses the term "domicile", case law construing the word "residence" of the insured is applicable in the instant case and provides the factors to be considered in making this determination. The record shows that the plaintiff, although temporarily staying at her mother's house, intended, if the accident had not happened, to return to a trailer which her father-in-law owned on his premises, in which she had lived before, and remain there for an indefinite time. Plaintiff was not looking for another place to live and considered the trailer her home, and her mailing address was the same as her father-in-law's. She used the facilities of his home, ate meals with his family, and during the day was "in and out" of the house. The trailer's electrical power and water supplies were connected to the house.

2. The Social Welfare Act and the Social Security Act make eligibility for Medicaid benefits contingent upon the finding that a claimant is "medically indigent" insofar as income or collateral resources are concerned. The plaintiff's no-fault personal protection benefits are a legal obligation to pay for the care of the plaintiff without regard to the income or resources of the plaintiff. Therefore, the plaintiff is expressly precluded by the Social Welfare Act from qualifying as a medically indigent person eligible for Medicaid benefits. Therefore Medicaid benefits are not benefits "required to be provided under the laws of any state or the federal government" under the terms of the no-fault insurance act. Any attempted set-off of the plaintiff's Medicaid benefits would not only be unnecessary, but also absurd because no "benefits" exist to be set off. The fact that the plaintiff has been "provided" Medicaid benefits covering injuries sustained in her accident does not alter this result. There exists no cognizable governmental benefit for the insurer to subtract from the plaintiff's no-fault personal protection insurance benefits under the mandates of the set-off provision. The Court expresses no opinion on the propriety of setting off other redundant, accident-related, *ex gratia* governmental transfer benefits.

3. The no-fault insurance act provides tort liability for non-

economic loss if the damages exceed certain thresholds. The Legislature intended to allow additional compensation for the catastrophically injured victim and the victim of extraordinary economic losses. In the light of this provision, and in compliance with the Due Process and Equal Protection Clauses, the subrogation provision of the no-fault act is construed to mean that an insurance carrier paying personal protection benefits is entitled to reimbursement from the tort recovery of the injured only to the extent that the tort recovery includes damages for which personal injury protection benefits were paid. Therefore, defendant Community Services may not subtract the amount of the plaintiff's tort recovery from the personal injury insurance benefits it must pay the plaintiff because the tort recovery was for non-economic losses for which personal injury insurance benefits are not paid.

Affirmed in part, reversed in part.

Justice Levin, joined by Chief Justice Kavanagh, disagreed with the Court on the question whether the plaintiff was domiciled in the same household as her father-in-law, and concurred in the disposition of the other issues.

1. The plaintiff is clearly a relative of her father-in-law, and had no permanent residence other than the trailer and intended to continue living there for an indefinite period. The question, therefore, is not whether she is a "relative" or "domiciled" in the trailer, but whether the trailer and the house or those there residing constituted a single household. The factors pointed to by the Court in concluding that there was a single household could be found with two families in a two-family house or apartment house, but the families would not constitute one household. A number of factors point to the opposite conclusion. The question then becomes whether the statutory language, "domiciled in the same household", should be construed to include a married son's separate abode simply because he enjoys a close relationship with his parents and has access to their house and draws water and electricity from their house. The clause should be construed in the context in which it is found, a provision allocating responsibility between insurers, not one creating entitlements. What is being decided is not whether no-fault benefits are payable at all but which of two insurers will pay them; a "liberal construction" will not effectuate the legislative purpose to provide no-fault benefits, and may distort another legislative purpose.

2. The Legislature has chosen to treat a relative of an insured as a unit with the insured provided they are "domiciled in the same household". The sections of the statute establishing

the order in which no-fault insurers are required to pay bene-fits appear to be a carefully considered division of responsibility between the automobile owner's insurer and the insurer of the injured person's relative. Members of the same household look to the relative's insurer, members of different households look to the vehicle's insurer. Because construction of the word "household" completely determines liability and the Legislature appears to have had a neutral purpose and to have attempted to draw the line down the middle between the two insurers, that word should be accorded as exact a meaning as possible. Too liberal a construction of the "domiciled in the same household" section does violence to the statute's allocation of the burden of providing first-party benefits by imposing additional insureds on the householder's insurer. Insurers should be able to calculate their risks. Knowledge of the approximate number of persons covered by their policies may be crucial to these predictions or premiums charged and there-fore the persons for whom they are responsible should be easily identifiable. The holding should be that members of the same household must live in the same dwelling unit, and that the plaintiff was not a member of her father-in-law's household.

3. The original language of the subrogation provision was unconditional: "after recovery is realized upon a tort claim, a subtraction shall be made to the extent of the recovery". There was no indication that the section was meant to be limited to double recoveries. The seeming unfairness of the provision does not authorize a court to rewrite it in the Legislature's name. While the Court's arguments are plausible, they seem to as-sume too much—that the sole purpose of reimbursement is to prevent double recovery—and to ignore many other possible purposes. There are other ways in which unconditional reim-bursement would further the goals of the no-fault system: there would be less litigation because a potential plaintiff would have to anticipate a tort recovery large enough to pay attorneys' fees and reimburse the no-fault insurer and still yield a net recov-ery sufficient to make the effort worthwhile; less of the pre-mium dollar would be spent on attorneys' fees and litigation costs and more would be available to pay actual insurance benefits; court congestion should be relieved; the cost of insur-ance would be reduced as money was plowed back into the system through reimbursement. These alternative rationales prevent saying that the unconditional reimbursement was un-constitutional or that the Legislature originally intended that reimbursement be required only when there was a duplicative recovery.

4. A recent amendment to the subrogation provision, 1978

PA 461, has become law. Whether legislation is to be applied retroactively depends on legislative intent. The enactment need not be made explicitly retroactive; legislative intent may be evidenced in other ways. When amendments are passed in the midst of controversy over a provision's meaning, the usual presumption that an amendatory act declares new law is overcome and a legislative intent to clarify rather than to change the law may be inferred. In this case, the circumstances attendant on the amendment's passage show that the Legislature intended its new version of the subrogation provision to control cases arising both before and after its enactment. Because it now appears that the Legislature intends to require reimbursement out of a third-party tort recovery only where the defendant is uninsured, the accident occurs out of state, or the injury was intentionally inflicted, the no-fault insurer in this case is not entitled to reimbursement from the tort settlement.

Justice Coleman agreed with the opinion of the Court on the set-off and subrogation issues, and she agreed with Justice Levin that the plaintiff was not domiciled in her father-in-law's household.

OPINION OF THE COURT

1. INSURANCE — NO-FAULT INSURANCE ACT — WORDS AND PHRASES — "RELATIVE".

As a matter of law a daughter-in-law is a "relative" of her father-in-law under the terms of the no-fault insurance act (MCL 500.3114[1]; MSA 24.13114[1]).

2. INSURANCE — WORDS AND PHRASES — DOMICILE — RESIDENCE — COMMON LAW.

The terms "domicile" and "residence" are legally synonymous, except in special circumstances; therefore, the body of law which deals with whether a person is a "resident" of an insured's household under the terms of particular insurance policies is analytically applicable to whether a claimant is "domiciled in the same household" as the insured.

3. INSURANCE — WORDS AND PHRASES — DOMICILE — RESIDENCE.

The terms "resident" of an insured's household or "domiciled" in the same household as an insured have no absolute meaning; the legal meaning of these terms must be viewed only in the context of the numerous factual settings possible.

.

4. INSURANCE — WORDS AND PHRASES — DOMICILE — RESIDENCE.

The factors to be considered in determining whether a claimant is a "resident" of an insured's household or "domiciled in the same household" include: (1) the subjective or declared intent of the claimant to remain, either permanently or for an indefinite time in the household, (2) the formality of the relationship between the claimant and the members of the household, (3) whether the claimant lives in the same house, within the same curtilage, or upon the same premises as the insured, and (4) whether the claimant has another place of lodging.

5. INSURANCE — WORDS AND PHRASES — DOMICILE — SAME HOUSE-HOLD AS THE INSURED.

A claimant of no-fault insurance benefits was "domiciled in the same household" as her father-in-law under the terms of his insurance policy where the claimant's intention was to remain living in a trailer on the insured's property for at least an indefinite length of time, the claimant was not looking for another place to live and considered the trailer her home, the claimant's mailing address was the same as the insured's, the claimant's relationship with the other members of the insured's family was friendly and informal, the claimant used the facilities of the house frequently, the trailer was owned by the insured and was supplied with electrical power and water from his house, there was no physical barrier between the house and trailer, and the claimant had left her previous home before moving into the trailer with no intention of returning (MCL 500.3114[1]; MSA 24.13114[1]).

6. SOCIAL SECURITY AND PUBLIC WELFARE — MEDICAID INSURANCE — NO-FAULT INSURANCE ACT — BENEFITS.

Eligibility for Medicaid benefits is contingent upon a finding that a claimant is medically indigent and a plaintiff's no-fault personal protection benefits are a legal obligation to pay for the care of the plaintiff without regard to the income or resources of the plaintiff; therefore a plaintiff who is eligible for no-fault insurance benefits is expressly precluded by the Social Welfare Act from qualifying as a medically indigent person eligible for Medicaid benefits (42 USC 1396, MCL 400.106, 500.3107; MSA 16.490[16], 24.13107).

7. SOCIAL SECURITY AND PUBLIC WELFARE — MEDICAID INSURANCE — NO-FAULT INSURANCE ACT — REDUCTION OF BENEFITS.

Medicaid benefits are not benefits "required to be provided under

the laws of any state or the Federal government" under the terms of the no-fault insurance act set-off provision; the fact that an injured claimant has been "provided" Medicaid benefits covering injuries sustained in an automobile accident does not alter the result that there exists no cognizable governmental benefit for the no-fault automobile insurer to subtract from the claimant's no-fault personal protection benefits (MCL 400.106, 500.3109[1]; MSA 16.490[16], 24.13109[1]).

8. STATUTES — CONSTRUCTION — LEGISLATIVE INTENT.

Provisions of a statute must be construed in light of the other provisions of the statute in such a manner as to carry out the apparent purpose of the Legislature and to permit its constitutional validity to be sustained.

9. STATUTES — CONSTRUCTION.

Effect must be given, if possible, in construing a statute to every word, sentence, and section; the entire act must be read so as to produce, if possible, a harmonious and consistent enactment as a whole.

10. STATUTES — CONSTRUCTION — CONSTITUTIONAL LAW.

Courts will, when the constitutional validity of a statute is in question, first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.

11. INSURANCE — NO-FAULT INSURANCE ACT — TORTS — REMEDIES — LEGISLATIVE INTENT.

The Legislature intended in the no-fault insurance act to allow the catastrophically injured victim of an automobile accident and the victim of extraordinary economic losses compensation through a limited tort remedy in addition to the personal protection insurance benefits payable under the act (MCL 500.3107, 500.3110, 500.3135; MSA 24.13107, 24.13110, 24.13135).

12. INSURANCE — NO-FAULT INSURANCE ACT — TORTS — REMEDIES — PERSONAL INJURY BENEFITS — REIMBURSEMENT.

An insurance carrier paying personal injury protection benefits is entitled to reimbursement from the tort recovery of a person injured by a motor vehicle accident only to the extent that the tort recovery includes damages for losses for which personal injury protection benefits were paid (MCL 500.3107, 500.3110, 500.3135; MSA 24.13107, 24.13110, 24.13135).

OPINION BY LEVIN, J.

13. INSURANCE — NO-FAULT INSURANCE — WORDS AND PHRASES —
   DOMICILE — CONSTRUCTION.

   *The language of the no-fault insurance act "domiciled in the
   same household" should be construed in the context in which it
   is found, a provision allocating responsibility between insurers,
   not one creating entitlements to benefits; where the question is
   which of several insurers will pay benefits a liberal construc-
   tion of the statute will not effectuate the purpose to provide
   benefits, and may distort another legislative purpose (MCL
   500.3114[1]; MSA 24.13114[1]).*

14. INSURANCE — NO-FAULT INSURANCE — WORDS AND PHRASES —
   HOUSEHOLD.

   *Members of the same "household" must live in the same dwelling
   unit as their insured relative to be eligible for no-fault benefits
   under the householder's no-fault insurance policy (MCL
   500.3114[1]; MSA 24.13114[1]).*

15. INSURANCE — NO-FAULT INSURANCE — WORDS AND PHRASES —
   HOUSEHOLD.

   *A plaintiff was not a member of her father-in-law's "household"
   under the no-fault insurance act where she lived with her
   husband in a trailer owned by her father-in-law, located on his
   property 40 to 50 feet from his house (MCL 500.3114[1]; MSA
   24.13114[1]).*

16. STATUTES — CONSTRUCTION — LEGISLATIVE INTENT.

   *The usual presumption that an amendatory act declares new law
   is overcome when an amendment is passed in the midst of
   controversy over a provision's meaning; a legislative intent to
   clarify rather than to change the law may be inferred.*

17. INSURANCE — NO-FAULT INSURANCE — THIRD-PARTY CLAIM —
   PERSONAL INJURY BENEFITS — REIMBURSEMENT — STATUTES —
   CONSTRUCTION.

   *The circumstances attendant on the passage of the amendment of
   the no-fault insurance act to require reimbursement of no-fault
   benefits after recovery is realized upon a third-party tort claim
   only where the defendant is uninsured, the accident occurs out
   of state, or the injury was intentionally inflicted satisfactorily
   show that the Legislature intended that amendment to control
   cases arising both before and after its enactment (1978 PA 461).*

OPINION BY COLEMAN, J.

See headnotes 6-15.

*Dilley & Dilley* (by *Robert W. Dilley)* for plaintiff.

*Allaben, Massie, Vander Weyden & Timmer* for defendant Detroit Automobile Inter-Insurance Exchange.

*Cholette, Perkins & Buchanan (Edward D. Wells,* of counsel) for defendant Community Services Insurance Company.

WILLIAMS, J. This No-Fault Insurance Act (MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.,* as amended) case, involving a woman passenger who lost the use of her limbs as the result of an accident in an automobile owned and driven by her sister, raises three issues: (1) the legal interpretation and application of "relative of either domiciled in the same household" in § 3114 of the act, because plaintiff had been living with her husband and child in a mobile home some 40 or 50 feet from her husband's parents' house, although they at the time of the accident were temporarily staying with plaintiff's younger sister in her mother's house while her mother was away; (2) whether § 3109(1) of the act, which provides "Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury" entitles the liable insurance carrier to subtract from personal injury protection insurance benefits otherwise due plaintiff the amount paid by Medicaid for plaintiff's medical expenses; (3) whether, under § 3116 of the act (which provides "after recovery

* * * a subtraction shall be made to the extent of the recovery"), the liable insurance carrier may subtract from the personal injury protection insurance no-fault benefits otherwise due plaintiff the amount of her recovery from the tortfeasor recovered pursuant to § 3135 of the act, which permits suit in tort "for noneconomic loss * * * if the injured person has suffered death, serious impairment of body function or permanent serious disfigurement".

First, we affirm, applying a four-point test to the facts, the trial court's holding that plaintiff, living in the mobile home next to her father-in-law, was "domiciled in the same household" as her father-in-law. Second, we affirm the trial court on different grounds and remand in accordance with our holding that since plaintiff is not eligible for a governmental Medicaid benefit "provided or required to be provided under the laws of any state", any set-off pursuant to § 3109(1) is impermissible as no cognizable governmental benefit exists to be subtracted. We express no opinion with respect to the propriety of a set-off of redundant, accident-related, *ex gratia* governmental transfer coverage. Finally, we hold that the seemingly absolute language of § 3116 which permits subtraction of tort recoveries from personal injury protection no-fault benefits must be read in connection with § 3135, which allows tort recovery for "noneconomic loss", to the effect that there may be subtraction for tort recoveries when the tort recovery includes damages for losses for which personal injury protection benefits were paid, but not for noneconomic recoveries permitted under § 3135.

## I. FACTS

Plaintiff Deborah Workman was injured and

rendered a paraplegic in a one-vehicle automobile accident on August 22, 1974, in Newaygo County, while an occupant of an automobile owned and being operated by her sister, Nancy Jo Fessenden (now Nancy Jo Magoon). As a consequence of the accident plaintiff sustained severe and disabling injuries.

In early August, 1974, plaintiff, her husband James Workman, Jr., and their child moved from an apartment into a travel trailer owned by plaintiff's father-in-law, James Workman, Sr. The trailer was located on James Workman, Sr.'s property, approximately 40 to 50 feet from his house.

In mid-August, 1974, either three or four days prior to the accident, plaintiff, her husband, and child went to stay with plaintiff's younger sister, Jody Fessenden, at the residence of her mother, Mrs. Joann Fessenden, so the younger sister would not be alone while her mother was away on vacation. When the accident occurred on August 22, 1974, plaintiff, her husband, and child were still staying at Mrs. Fessenden's residence. However, they planned to return to the trailer as soon as Mr. Workman's parents returned from a vacation they were to take when their son and his family went to Mrs. Fessenden's.

When the accident occurred, neither plaintiff nor her husband owned a motor vehicle. Because of this fact, on November 29, 1974, plaintiff filed suit to obtain declaratory judgment in Kent Circuit Court to determine which of three insurance companies was responsible for providing her personal injury protection insurance benefits under Michigan's No-Fault Insurance Act, 1972 PA 294 as amended, MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.* (hereinafter referred to as the "No-Fault Act" or "the act"). Because neither plaintiff nor

her husband owned a motor vehicle themselves, the relevant statutory provision for determining which insurer was responsible to her for personal injury protection insurance benefits is § 3114. Under § 3114(1), as amended by 1975 PA 137, "a personal protection insurance policy applies to accidental bodily injury to the person named in the policy, his spouse *and a relative of either domiciled in the same household".* Thus, arguably, plaintiff's mother's insurer, Wolverine Insurance Company, was responsible for providing plaintiff's personal injury benefits if plaintiff was "domiciled in the same household" as her mother. Or, arguably, plaintiff's father-in-law's insurer, Community Services Insurance Company, was responsible for providing plaintiff's personal injury benefits if plaintiff was "a relative" to him and was "domiciled in the same household". However, if neither of the above situations were applicable, *i.e.,* § 3114(1) was not applicable to this case, then § 3114(4)(a) would come into effect. This provision states:

"(4) Except as provided in subsections (1) to (3), a person suffering accidental bodily injury while an occupant of a motor vehicle shall claim personal protection insurance benefits from insurers in the following order of priority:

"(a) The insurer of the owner or registrant of the vehicle occupied." MCL 500.3114(4); MSA 24.13114(4).

If § 3114(4)(a) were applicable, plaintiff's sister Nancy Jo Fessenden's insurer, Detroit Automobile Inter-Insurance Exchange, would be responsible for providing her personal injury benefits.

On May 5, 1975, the trial court granted a summary judgment of no cause of action to Wolverine Insurance Company on the insurance policy cover-

ing plaintiff's mother, Mrs. Joann Fessenden, on the basis that plaintiff was not domiciled at her mother's residence when the accident occurred.

On September 19, 1975, after trial between plaintiff and the remaining two defendants, Community Services Insurance Company and Detroit Automobile Inter-Insurance Exchange, the court held defendant Community Services Insurance Company (plaintiff's father-in-law's insurer) responsible for providing plaintiff personal injury protection insurance benefits under the No-Fault Act. In addition, the court held there was no cause of action as to defendant Detroit Automobile Inter-Insurance Exchange (plaintiff's sister's insurer).

The proceedings at this point become factually complicated.

On October 2, 1975, plaintiff made a motion to reopen proofs and for summary judgment with respect to the following relief she prayed for in the first amended complaint of April 18, 1975:

"Comes now the above named plaintiff and amends her complaint by addition to the prayer for relief as follows:

"(e) determine that benefits payable to plaintiff under the No-Fault Automobile Insurance Statute are not subject to reduction by benefits paid or payable to plaintiff by Michigan Department of Social Services under its Medicaid program; that is [MCL 500.3109(1); MSA 24.13109(1)] does not apply to benefits paid or payable under the Medicaid program operated by Michigan Department of Social Services."

On October 10, 1975, defendant Community Services Insurance Company appealed the judgment in favor of Detroit Automobile Inter-Insurance Exchange to the Court of Appeals. On October 14, 1975, plaintiff cross-appealed. On this same date,

the court also granted plaintiff's October 2 motion to reopen proofs with respect to the issue stated in her April 18 amended complaint. On November 28, 1975, plaintiff filed a second amended complaint, and the court granted leave to further amend her complaint, this time to include the following issue:

"Comes now the above named plaintiff and further amends her complaint as amended on April 18, 1975, by addition to the prayer for relief as follows:

"(f) determine that the defendant adjudged by this court to be liable to plaintiff for no-fault benefits is not entitled to subtraction from no-fault benefits accrued nor reimbursement for no-fault benefits paid, in respect to plaintiff's recovery from the third-party tortfeasor."

Importantly, while the above proceedings were taking place, plaintiff and her husband had brought suit in tort for the injuries she sustained in the accident. The elements of damages claimed in their complaint were limited to "noneconomic loss" as provided for by § 3135 of the No-Fault Act (quoted part IV, p 505 *infra* and see fn 1 *infra).* In December, 1975, the case was settled for $17,500, and plaintiff received the entire amount of the settlement proceeds (the above facts relating to this tort suit and the subsequent settlement are acknowledged in the record in a "Concise Statement of Proceedings and Facts" filed by the parties on February 17, 1976).

On December 22, 1975, the trial court entered an opinion as to the two issues "reopened" at trial. On January 9, 1976, the trial court entered the following supplemental judgment as to the two "reopened" issues:

"Now, therefore, it is ordered and adjudged, and the

court does hereby determine, that § 3109(1) of the Michigan No-Fault Automobile Insurance Law [MCL 500.3109(1); MSA 24.13109(1)] does not apply to benefits paid or payable to plaintiff by or through the Michigan Department of Social Services as Medicaid, and that no subtraction shall be made on that account from benefits otherwise payable to or for the benefit of plaintiff under said no-fault law.

"It is further ordered and adjudged, and the court does hereby determine, that § 3116 of said no-fault law violates the equal protection provision, article 1, § 2, and the due process provision, article 1, § 17, of the Michigan Constitution of 1963, and is therefore unconstitutional, to the extent that it directs subtraction from no-fault benefits otherwise payable to plaintiff for the recovery obtained by her in Kent Circuit Court Case No. 75-17844-NI, *Workman v Magoon,* and to the extent that it grants the no-fault insurance carrier a lien upon said recovery."

(See § 3116 quoted in part IV, p 506 *infra*).

Defendant Community Services Insurance Company then filed an appeal to the Court of Appeals with respect to this supplemental judgment.

On February 17, 1976, both plaintiff and defendant Community Services Insurance Company joined in application for leave to appeal to this Court prior to decision of the Court of Appeals. Defendant Detroit Automobile Inter-Insurance Exchange filed a brief in support of this application for leave to appeal. The parties in their "Concise Statement of Proceedings and Facts" stipulated that the "issues presented on appeal are these":

"(a) Which defendant is liable to plaintiff for no-fault benefits?

"(b) Does § 3109(1) of the No-Fault Act entitle the liable carrier to subtract from no-fault benefits otherwise due plaintiff the amount paid by Medicaid on plaintiff's medical expense?

"(c) Does § 3116 of the No-Fault Act entitle the liable carrier to subtract from no-fault benefits otherwise due plaintiff the amount of her recovery from the tortfeasor?"

On June 1, 1976, this Court granted by-pass leave as to these issues.[1]

## II. WHICH DEFENDANT IS RESPONSIBLE TO PLAINTIFF FOR PAYMENT OF PERSONAL INJURY PROTECTION INSURANCE BENEFITS UNDER THE NO-FAULT ACT?

The first issue before us is the determination of which defendant, Community Services Insurance Company (hereinafter referred to as Community Services) or Detroit Automobile Inter-Insurance

---

[1] These issues come to us on appeal of a judgment of a request for declaratory relief. GCR 1963, 521.1, the declaratory judgment rule, requires that plaintiffs, in order to establish standing pursuant to this rule, must show a "case of actual controversy". See *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978).

The fact that plaintiff has standing pursuant to this rule with respect to the issues raised is undisputed. We wish to note, however, that in *Shavers v Attorney General, supra,* we held that the plaintiffs in that case lacked standing to seek declaratory relief with respect to the question of whether § 3116 of the No-Fault Act entitles an insurance carrier to subtract from personal injury protection insurance benefits otherwise due a person injured as a result of a motor vehicle accident the amount the injured person recovered from a tortfeasor. Our holding was based on the fact that "[t]here is no proof on the record that any plaintiff had realized a tort claim which an insurer subtracted from the personal injury protection benefits which he received or to which he was entitled." 402 Mich 592, fn 13.

We clearly have no such problem here with respect to this issue. In the "Concise Statement of Proceedings and Facts" the parties stipulated that:

"In the meantime, plaintiff and her husband had brought suit on their tort liability claims *(Workman v Magoon,* Kent Circuit Court Case No. 75-17844-NI). The elements of damages claimed in their Complaint were limited to those preserved by [MCL 500.3135; MSA 24.13135] of the No-Fault Act. The case was settled in December, 1975 for $17,500, and plaintiff Deborah Workman has received the entire amount of the settlement proceeds."

Thus, we are squarely faced with a "case of actual controversy" concerning the interpretation of § 3116.

Exchange (hereinafter referred to as DAIIE), is responsible to plaintiff for payment of personal injury protection insurance benefits under the No-Fault Act.

This question arises because neither plaintiff nor her spouse owned a motor vehicle.[2] Because of this fact, the relevant statutory scheme for determining which insurance carrier is responsible to plaintiff for payment of personal injury protection insurance benefits is § 3114 of the act, in particular subsections (1) and (4)(a). Section 3114 provides, in pertinent part:

"(1) Except as provided in subsections (2) and (3), a personal protection insurance policy applies to accidental bodily injury to the person named in the policy, his spouse, and a relative of either domiciled in the same household. * * *

* * *

"(4) Except as provided in subsections (1) to (3), a person suffering accidental bodily injury while an occupant of a motor vehicle shall claim personal protection insurance benefits from insurers in the following order of priority:

"(a) The insurer of the owner or registrant of the vehicle occupied." MCL 500.3114; MSA 24.13114.

As our statement of facts indicates, defendant Community Services is the insurer of James Workman, Sr., plaintiff's father-in-law. Defendant DAIIE is the insurer of Nancy Jo Fessenden, the owner and registrant of the motor vehicle in which plaintiff was an occupant (or passenger)

---

[2] If plaintiff or her husband had owned a motor vehicle, her insurer or her husband's insurer would have been responsible to her for payment of personal injury protection insurance benefits pursuant to the following language of § 3114(1) of the act: "a personal protection insurance policy applies to accidental bodily injury to the person named in the policy, his spouse". MCL 500.3114(1); MSA 24.13114(1).

when she was injured. At trial, and before us, Community Services argues that it is not responsible to plaintiff for payment of personal injury insurance benefits pursuant to § 3114(1) because plaintiff was not "a relative of [and] domiciled in the same household" as its insured, her father-in-law James Workman, Sr. If Community Services is correct in its argument, it is undisputed that DAIIE is responsible to plaintiff for payment of personal injury protection insurance benefits, because its insured, Nancy Jo Fessenden, was, under § 3114(4)(a), owner and registrant of the motor vehicle in which plaintiff was an occupant when she was injured.

Therefore, for purposes of analysis, the dispositive question is whether plaintiff was a "relative of [and] domiciled in the same household" as her father-in-law James Workman, Sr. If the answer to this is yes, Community Services is responsible to plaintiff for payment of personal injury protection insurance benefits. If the answer is no, DAIIE is responsible to plaintiff for these benefits.

We agree with the trial court that the answer to this question is yes: plaintiff was a "relative of [and] domiciled in the same household" as her father-in-law, James Workman, Sr.

In reaching this conclusion, it is necessary to address, analytically, two considerations: (1) whether plaintiff was a "relative" of Community Services' insured, plaintiff's father-in-law, James Workman, Sr.; and (2) whether plaintiff was "domiciled in the same household" as James Workman, Sr.

The consideration of whether plaintiff was a "relative" of her father-in-law, James Workman, Sr., need not detain us long. Community Services,

in its brief, concedes the fact that as a matter of law "plaintiff is a relative of Mr. Workman, Sr."[3]

Whether plaintiff was "domiciled in the same household" as James Workman, Sr., is, analytically, a more complicated consideration. It has not been brought to our attention, nor have we been able to find a case which deals specifically with the interpretation of an insurance policy or statute containing the language "domiciled in the same household". However, the parties to this case have brought to our attention a body of law which deals with the question of whether a person is a "resident" of an insured's "household" under particular insurance policies. Although the statutory language of § 3114(1) refers to persons *"domiciled* in the same household" as an insured, we believe this body of law is analytically applicable to the consideration before us. We conclude this because, in this state, the terms "domicile" and "residence" are legally synonymous (except in special circumstances).[4]

Our review of both Michigan opinions and opinions of our sister state courts first reveals the general principle that the terms "resident" of an insured's "household" or, to the same effect, "domiciled in the same household" as an insured, have "no absolute meaning", and that their meaning "may vary according to the circumstances". *Cal-*

---

[3] See Brief on Appeal—Appellant, p 12, where defendant-appellant Community Services acknowledges: "sticking to the interpretation of the statute itself, plaintiff is a relative of Mr. Workman, Sr." *See also,* in support of this conclusion, *Bliss v Caille Brothers Co,* 149 Mich 601, 608; 113 NW 317 (1907).

[4] *Gluc v Klein,* 226 Mich 175, 178; 197 NW 691 (1924); *Hartzler v Radeka,* 265 Mich 451, 452; 251 NW 554 (1933); *Reaume & Silloway, Inc v Tetzlaff,* 315 Mich 95; 23 NW2d 219 (1946). For an example of such a "special circumstance", see *School District No 1, Fractional, of Mancelona Twp v School District No 1 of Custer Twp,* 236 Mich 677, 681; 211 NW 60 (1926); *Ortman v Miller,* 33 Mich App 451, 458; 190 NW2d 242 (1971).

*Farm Ins Co v Boisseranc,* 151 Cal App 2d 775, 781; 312 P2d 401, 404 (1957). The "legal meaning" of these terms must be viewed flexibly, "only within the context of the numerous factual settings possible". *Montgomery v Hawkeye Security Ins Co,* 52 Mich App 457, 461; 217 NW2d 449 (1974).

Accordingly, both our courts and our sister state courts, in determining whether a person is a "resident" of an insured's "household" or, to the same analytical effect, "domiciled in the same household" as an insured, have articulated a number of factors relevant to this determination. In considering these factors, no one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others.[5] Among the relevant factors are the following: (1) the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his "domicile" or "household"; *Hartzler v Radeka,* 265 Mich 451; 251 NW 554 (1933); *Henry v Henry,* 362 Mich 85, 101; 106 NW2d 570 (1960); *Iowa National Mutual Ins Co v Boatright,* 33 Colo App 124, 127; 516 P2d 439, 440 (1973); *Hardware Mutual Casualty Co v Home Indemnity Co,* 241 Cal App 2d 303; 50 Cal Rptr 508 (1966); (2) the formality or informality of the relationship between the person and the members of the household; *Iowa National Mutual Ins Co v Boatright, supra; Pamperin v Milwaukee Mutual Ins Co,* 55 Wis 2d 27, 33; 197 NW2d 783, 788 (1972); (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises, *Mazzilli v Accident & Casualty Ins Co of Winterthur,*

---

[5] See *Montgomery v Hawkeye Security Ins Co,* 52 Mich App 457, 461; 217 NW2d 449 (1974).

*Switzerland,* 35 NJ 1; 170 A2d 800, 804 (1961);[6] (4) the existence of another place of lodging by the person alleging "residence" or "domicile" in the household; *Iowa National Mutual Ins Co v Boatright, supra;* see also *State Farm Mutual Automobile Ins Co v Holloway,* 423 F2d 1281 (CA 10, 1970).

When the above factors are tested against the facts in the record in this case, it is overwhelmingly clear, as the trial court held, that plaintiff was "domiciled in the same household" as her father-in-law, James Workman, Sr.

First, the record reveals facts indicating it was plaintiff's intention to remain living in the trailer on the property of James Workman, Sr., for at least an indefinite length of time. Plaintiff testified that although she, her husband and child were temporarily staying with her younger sister in her mother's home when the accident occurred, if the accident had not happened, it was her family's intention to have gone back to the trailer and remain living there "for an indefinite period of time". Plaintiff further testified that she and her husband were not looking for any other place to live and that she considered the trailer as her home. In addition, she testified that her family's mailing address was the same as her father-in-law's. Second, the record reveals facts indicating that the relationship between plaintiff, her hus-

---

[6] We emphasize, again, that "no one factor is, in itself, determinative" in making a determination of whether a person is a "resident" of an insured's household. For an example of a case in which a person did not "live in the same house, within the same curtilage or upon the same premises" as an insured but was found by the court to be, nevertheless, a "resident" of the insured's "household", on balance of other relevant factors, see *Montgomery v Hawkeye Security Ins Co, supra.* In other words, analytically, if a person does, in fact, "live in the same house, within the same curtilage or upon the same premises" as an insured, there is more weight in support of the conclusion he is a "resident" of the insured's "household".

band and child, and her father-in-law's family was informal and friendly. Plaintiff testified that she was welcome to use and did use all of the facilities of the house (i.e., telephone, washers and dryers, and electricity, by cord from the house to the trailer), that her family ate meals with the senior Workman's family, and that during the day she and her child were "in and out" of the house. Third, the record reveals that the trailer in which plaintiff and her family lived was unquestionably on the same premises, or property, as her father-in-law's house, and that the trailer belonged to her father-in-law. The trailer was located 40 to 50 feet from the house. The electrical power for the trailer was supplied by a cord attached to the house and water for the trailer was provided by means of a hose connected to the house. Furthermore, testimony established there was no fence or physical barrier of any type between the house and the trailer. Fourth, the record reveals that plaintiff and her family had left the apartment they were living in prior to moving into the trailer and had no intention of returning there (or to any other lodging).

For these reasons, we hold that plaintiff was, under § 3114(1) of the No-Fault Act, "a relative of [and] domiciled in the same household" as her father-in-law, James Workman, Sr. Accordingly, we affirm the trial court's conclusion that Community Services Insurance Company is responsible to plaintiff for personal injury protection insurance benefits under the No-Fault Act.

III. WHETHER § 3109(1) OF THE NO-FAULT ACT
APPLIES TO MEDICAID BENEFITS AUTHORIZED BY
THE SOCIAL WELFARE ACT AND ADMINISTERED
BY THE MICHIGAN DEPARTMENT OF SOCIAL
SERVICES

In 1974, plaintiff was rendered a paraplegic as a

consequence of an automobile accident. Plaintiff claimed state "Medicaid" benefits, MCL 400.105 *et seq.;* MSA 16.490(15) *et seq.,* as a "medically indigent individual", MCL 400.106; MSA 16.490(16),[7] under the Michigan Social Welfare Act, 1939 PA 280.

Section 3109(1) of the No-Fault Act provides:

"Benefits *provided or required to be provided under the laws of any state* or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury." (Emphasis supplied.) MCL 500.3109(1); MSA 24.13109(1).

Defendants contend that, if they are held liable as plaintiff's no-fault insurer, the amount of state governmental Medicaid benefits paid or payable on behalf of plaintiff's medical expense should be subtracted from plaintiff's § 3107(a) personal protection insurance benefits[8] pursuant to § 3109(1).

---

[7] The parties have stipulated that an indeterminate amount of plaintiff's medical expenses have been paid by Medicaid and that payment of the balance by that program awaits our resolution of this case. While the parties do not expressly state under which provision of the Medicaid program plaintiff seeks to qualify as a statutory "medical indigent", we assume that she is seeking medical assistance under MCL 400.106(2); MSA 16.490(16)(2) as she is apparently not an "aid to dependent children" recipient, MCL 400.106(1); MSA 16.490(16)(1).

[8] Section 3107(a) of the No-Fault Act provides that personal protection insurance benefits are payable for the following medical losses:

"(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations except when the injured person requires special or intensive care, or charges for funeral and burial expenses in excess of $1,000.00." MCL 500.3107(a); MSA 24.13107(a).

Sections 106(2)(b) and 109 ("medical services provided under * * * act") of the Social Welfare Act evidence that Medicaid recipients are

Considering this contention, the trial court declared in its supplemental judgment that, as a matter of "statutory construction", § 3109(1)

"does not apply to benefits paid or payable to plaintiff by or through the Michigan Department of Social Services as Medicaid, and that no subtraction shall be made on that account from benefits otherwise payable to or for the benefit of plaintiff under said no-fault law."

We disagree with the trial court's ruling insofar as it is apparently based on the mistaken assumption that plaintiff is eligible for a "governmental" benefit cognizable under the § 3109(1) set-off scheme. Any consideration of the propriety of a § 3109(1) governmental benefit set-off is thereby rendered unnecessary; there exist no "benefits provided or required to be provided under the laws of" Michigan to be arguably set off by defendants.

The Social Welfare Act, 1939 PA 280, was enacted by the Michigan Legislature " * * * to protect the welfare of the people of this state; to provide general relief, hospitalization, infirmary and medical care to poor or unfortunate persons * * * ", long title of 1939 PA 280. "Medicaid" is a "program for medical assistance for the medically indigent", MCL 400.105; MSA 16.490(15), authorized by the Social Welfare Act and administered by the Michigan Department of Social Services, MCL 400.105; MSA 16.490(15). The Medicaid program is required to be administered pursuant to subchapter XIX, 42 USC 1396 *et seq.,* of the Federal Social Security Act, MCL 400.105; MSA 16.490(15). Subchapter XIX was enacted by the United States Congress

---

entitled to similar medical coverage as that permitted under § 3107(a) of the No-Fault Act.

"For the purpose of enabling each State, * * * to furnish (1) medical assistance on behalf of * * * disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, * * * ." 42 USC 1396.

It is clear from the sense of the above provisions as well as the express language of § 105 of the Social Welfare Act that eligibility for Medicaid is contingent upon the finding that a claimant is "medically indigent" insofar as that individual's income or collateral resources are concerned. In fact, § 106 of the Social Welfare Act specifically defines a "medically indigent individual" in relevant part as follows:

"(b) His need for the type of medical assistance available under this act for which application has been made has been professionally established *and no payment for it is available through the legal obligation of a contractor, public or private, to pay or provide for the care without regard to the income or resources of the patient.* The department shall be subrogated to any right of recovery which a patient may have for the cost of hospitalization, pharmaceutical services, physician services, and nursing services not to exceed the amount of funds expended by the department for such care and treatment of the patient. The patient or other person acting in his behalf shall execute and deliver an assignment of claim or other authorizations as necessary to secure the right of recovery to the department. * * * " MCL 400.106(2); MSA 16.490(16)(2). (Emphasis supplied.)

We perceive plaintiff's § 3107(a) no-fault personal protection insurance coverage with defendant-insurers to constitute " * * * [medical assistance] available through the legal obligation of a contractor, public or private, to pay or provide for the care without regard to the income or resources

of the patient".[9] As such, plaintiff is expressly precluded from qualifying as a medically indigent individual eligible for medical assistance under the state Medicaid program. This finding requires us to conclude that Medicaid benefits are not in the nature of § 3109(1) benefits "required to be provided under the laws of any state or the federal government"; any attempted set-off of plaintiff's Medicaid benefits would, therefore, not only be unnecessary but absurd since no "benefits" exist to be set off.

Further, the fact that plaintiff has been "provided" Medicaid benefits covering injuries sustained in her accident does not alter this result. Both §§ 106(2)(b)[10] and 107[11] of the Social Welfare

[9] Further support for our conclusion that no-fault personal protection insurance coverage is in the nature of a "legal obligation of a [private] contractor" sufficient to preclude Medicaid eligibility is found in the 1976 amendatory language to § 106(2)(b) of the Social Welfare Act not found in that section when this action was instituted. This amendatory language specifically excludes Medicaid eligibility where the claimant is entitled to no-fault coverage unless the claimant's entitlement to that collateral coverage is at issue. Specifically, this language provides:

"A payment may be withheld under this act for medical assistance for an injury or disability for which the patient is entitled to medical care or reimbursement for the cost of medical care under sections 3101 to 3179 of Act No. 218 of the Public Acts of 1956, as amended, being sections 500.3101 to 500.3179 of the Michigan Compiled Laws, or under any other policy of insurance providing medical or hospital benefits, or both, for the patient unless the patient's entitlement to that medical care or reimbursement is at issue." MCL 400.106(2)(b); MSA 16.490(16)(2)(b). Amended by 1976 PA 284, imd eff October 20.

Although this language was not in esse at the time plaintiff commenced this action, we find it to constitute persuasive authority for our ruling in this regard.

[10] Section 106(2)(b) of the Social Welfare Act in discussing the effect of collateral insurance coverage on Medicaid eligibility provides in pertinent part as follows:

"The department shall be subrogated to any right of recovery which a patient may have for the cost of hospitalization, pharmaceutical services, physician services, and nursing services not to exceed the amount of funds expended by the department for such care and treatment of the patient. The patient or other person acting in his behalf shall execute and deliver an assignment of claim or other

Act contemplate that under certain circumstances Medicaid benefits may potentially be made available to medically solvent individuals.[12] In such instances, however, those statutes further provide that the Department of Social Services shall be entitled to a right of either subrogation or reimbursement to the extent of those Medicaid benefits paid.

Insofar as our reading of § 106(2)(b) of the Social Welfare Act is concerned, we are of the opinion that plaintiff is not statutorily eligible to receive state Medicaid benefits. As such, we are not here confronted with a state governmental benefit "provided or required to be provided under the laws of

authorizations as necessary to secure the right of recovery to the department." MCL 400.106(2)(b); MSA 16.490(16)(2)(b). (Emphasis supplied.)

[11] MCL 400.107; MSA 16.490(17) provides:

"In establishing financial eligibility for the medically indigent as defined in section 106(2) income shall be disregarded in accordance with standards established for the related categorical assistance program. Additional income shall be applied against: (i) the cost of medical care not authorized under this act, and (ii) the cost of services authorized under this act, in excess of the basic amount. For medical assistance only, income shall include the amount of contribution which an estranged spouse or parent for a minor child is making to the applicant according to the standards of the state department, or pursuant to a court determination, if there is such a determination. Nothing in this section shall eliminate the responsibility of support established in section 76 for cash assistance received under this act."

[12] Similar provision is made in the 1976 amendatory language to § 106(2)(b) of the Social Welfare Act:

"A payment may be withheld under this act for medical assistance for an injury or disability for which the patient is entitled to medical care or reimbursement for the cost of medical care under sections 3101 to 3179 of Act No. 218 of the Public Acts of 1956, as amended, being sections 500.3101 to 500.3179 of the Michigan Compiled Laws, or under any other policy of insurance providing medical or hospital benefits, or both, for the patient *unless the patient's entitlement to that medical care or reimbursement is at issue.*" MCL 400.106(2)(b); MSA 16.490(16)(2)(b), amended by 1976 PA 284, § 1 imd eff October 20. (Emphasis supplied.)

This provision is qualified by the Department of Social Services statutory right of recovery to the extent of Medicaid benefits paid at such time as the claimant's "entitlement to [no-fault] medical care" is no longer determined to be at issue.

any state or the federal government", an element requisite to the operation of § 3109(1). Accordingly, absent this pivotal element, we need not reach the § 3109(1) set-off urged by the parties and adjudicated by the trial court as there exists no cognizable governmental benefit for the insurer to subtract from plaintiff's § 3107(a) personal protection insurance benefits under the mandates of § 3109(1). We, therefore, affirm on different grounds the trial court's order disallowing the set-off and remand this issue for disposition consistent with this opinion. We express no opinion with respect to the propriety of setting off other redundant, accident-related, *ex gratia* governmental transfer benefits.

### IV. WHETHER § 3116 OF THE NO-FAULT ACT ENTITLES COMMUNITY SERVICES TO SUBTRACT FROM PLAINTIFF'S PERSONAL INJURY PROTECTION INSURANCE BENEFITS THE AMOUNT RECEIVED BY PLAINTIFF IN TORT RECOVERY FROM THE TORTFEASOR

The third issue before us is whether § 3116 of the No-Fault Act entitles Community Services Insurance Company (the insurer responsible to plaintiff for payment of personal injury protection insurance benefits) to subtract from these benefits the amount plaintiff received (after settlement) in tort recovery from the tortfeasor, Nancy Jo Fessenden.

As indicated in our statement of facts, plaintiff moved to amend her complaint to include this issue after the trial court had decided the question of which insurer was responsible to plaintiff for payment of personal injury protection insurance benefits. See discussion part I, *supra,* p 488. Also, the record indicates that before the trial court

entered its supplemental judgment as to this issue, plaintiff settled a tort suit against Nancy Jo Fessenden, the operator of the motor vehicle in which she was injured, for $17,500. This suit was brought pursuant to § 3135 of the No-Fault Act, which provides:

"(1) A person remains *subject to tort liability for noneconomic loss* caused by his ownership, maintenance or use of a motor vehicle *only if the injured person has suffered* death, serious *impairment of body function or permanent serious disfigurement.*

"(2) Notwithstanding any other provision of law, *tort liability* arising from the ownership, maintenance or use within this state of a motor vehicle with respect to which the security required by subsections (3) and (4) of section 3101 was in effect *is abolished except as to:*

"(a) Intentionally caused harm to persons or property. Even though a person knows that harm to persons or property is substantially certain to be caused by his act or omission, he does not cause or suffer such harm intentionally if he acts or refrains from acting for the purpose of averting injury to any person, including himself, or for the purpose of averting damage to tangible property.

"(b) *Damages for noneconomic loss as provided and limited in subsection (1).*

"(c) Damages for allowable expenses, work loss and survivor's loss as defined in sections 3107 to 3110 in excess of the daily, monthly and 3 year limitations contained in those sections. The party liable for damages is entitled to an exemption reducing his liability by the amount of taxes that would have been payable on account of income the injured person would have received if he had not been injured." MCL 500.3135; MSA 24.13135. (Emphasis added.)

Plaintiff contends that she is entitled to the full amount of her tort recovery against Nancy Jo Fessenden (subject to attorney fees and costs). Community Services argues that § 3116 of the No-

Fault Act entitles it to subtract this amount (exclusive of reasonable attorney fees and costs) from the personal injury protection insurance benefits it must pay plaintiff. This section provides:

"(1) A subtraction from personal protection insurance benefits shall not be made because of the value of a claim in tort based on the same accidental bodily injury. However, after recovery is realized upon a tort claim, a subtraction shall be made to the extent of the recovery, exclusive of reasonable attorneys' fees and other reasonable expenses incurred in effecting the recovery. If personal protection insurance benefits have already been received, the claimant shall repay to the insurers out of the recovery a sum equal to the benefits received, but not more than the recovery exclusive of reasonable attorneys' fees and other reasonable expenses incurred in effecting the recovery. The insurer shall have a lien on the recovery to this extent. A recovery by an injured person or his estate for loss suffered by him shall not be subtracted in calculating benefits due a dependent after the death and a recovery by a dependent for loss suffered by the dependent after the death shall not be subtracted in calculating benefits due the injured person.

"(2) A personal protection insurer with a right of reimbursement under subsection (1), if suffering loss from inability to collect reimbursement out of a payment received by a claimant upon a tort claim is entitled to indemnity from a person who, with notice of the insurer's interest, made such a payment to the claimant without making the claimant and the insurer joint payees as their interests may appear or without obtaining the insurer's consent to a different method of payment." MCL 500.3116; MSA 24.13116.

The trial court, in its supplemental judgment, declared:

"It is further ordered and adjudged, and the court does hereby determine, that § 3116 of said no-fault law

violates the equal protection provision, art 1, § 2, and the due process provision, art 1, § 17, of the Michigan Constitution of 1963, and is therefore unconstitutional, to the extent that it directs subtraction from no-fault benefits otherwise payable to plaintiff for the recovery obtained by her in Kent Circuit Court Case No. 75-17844-NI, *Workman v Magoon,* and to the extent that it grants the no-fault insurance carrier a lien upon said recovery."

Although we agree with the *effect* of the trial court's judgment, i.e., Community Services may *not* subtract the amount of plaintiff's tort recovery (exclusive of reasonable attorney fees and costs) pursuant to § 3116, we disagree with its disposition of this issue on constitutional grounds.

It is a well-established, cardinal rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute, in such a manner as to carry out the apparent purpose of the Legislature and to permit its constitutional validity to be sustained. *In re Petition of Bryant,* 323 Mich 424, 437; 35 NW2d 371 (1949). Accordingly, as stated in *Grand Rapids v Crocker,* 219 Mich 178, 182-183; 189 NW 221 (1922), in construing the meaning of particular statutory provisions, it is elementary that

"effect must be given, if possible, to every word, sentence and section. To that end, the entire act must be read, and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole."

See also *Dussia v Monroe County Employees Retirement System,* 386 Mich 244, 248; 191 NW2d 307 (1971).

Or, as Justice Brandeis stated in his concurring

opinion in *Ashwander v Tennessee Valley Authority,* 297 US 288, 348; 56 S Ct 466; 80 L Ed 688 (1936):

" 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " (Citation omitted.)

The issue raised in this case is the alleged conflict between § 3135 and § 3116 of the No-Fault Act.

Section 3135, in particular subds (1), (2)(b) and (2)(c) provide a specific threshold for motor-vehicle accident-related tort suits, *i.e.,* tort liability is *not* abolished with respect to "noneconomic loss"[13] if the injured person "has suffered death, serious impairment of body function or permanent serious disfigurement" (§§ 3135[1], 3135[2][b]) and if the injured person's "[d]amages for allowable expenses, work loss and survivor's loss as defined in sections 3107 to 3110" are "in excess of the daily, monthly, and 3 year limitations contained in those sections" (§ 3135[2][c]).[14] The legislative intent, inferable

[13] See fn 1, *supra.*

[14] Section 3107 provides:

"Personal protection insurance benefits are payable for the following:

"(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations except when the injured person requires special or intensive care, or charges for funeral and burial expenses in excess of $1,000.00.

"(b) Work loss consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he had not been injured and expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and neces-

from the face of this provision, is clear: the Legislature intended to allow the catastrophically injured victim and the victim of extraordinary economic losses compensation in addition to that provided by §§ 3107 to 3110 of the act.

Section 3116 provides, in pertinent part:

"after recovery is realized upon a tort claim, a subtraction shall be made to the extent of the recovery, exclusive of reasonable attorneys' fees and other reasonable expenses incurred in effecting the recovery. If personal protection insurance benefits have already been received, the claimant shall repay to the insurers out of the recovery a sum equal to the benefits received." MCL 500.3116; MSA 24.13116.

If this statutory language is literally construed and read alone, then an insurer, "after recovery is realized upon a tort claim", may subtract personal injury protection insurance benefits "to the extent of the recovery", etc. However, if this statutory language is read in the light of § 3135, we are left with an apparent and patent absurdity: the Legis-

---

sary services in lieu of those that, if he had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or of his dependent. Work loss does not include any loss after the date on which the injured person dies. Because the benefits received from personal protection insurance for loss of income are not taxable income, the benefits payable for such loss of income shall be reduced 15% unless the claimant presents to the insurer in support of his claim reasonable proof of a lower value of the income tax advantage in his case, in which case the lower value shall apply. The benefits payable for work loss sustained in a single 30-day period and the income earned by an injured person for work during the same period together shall not exceed $1,000.00 which maximum shall apply pro rata to any lesser period of work loss. The maximum shall be adjusted annually to reflect changes in the cost of living under rules prescribed by the commissioner but any change in the maximum shall apply only to benefits arising out of accidents occurring subsequent to the date of change in the maximum." MCL 500.3107; MSA 24.13107.

Section 3110 defines those persons who are "dependents of a deceased person" for purposes of "survivor's loss". MCL 500.3110; MSA 24.13110.

lature, on the one hand, provides an injured person limited tort remedy in § 3135 of the act while, on the other hand, providing that any tort recovery achieved pursuant to § 3135 will be effectively taken away under § 3116 of the act.

This absurdity can be avoided, however, by applying the rules of statutory construction articulated *supra, i.e.,* by construing § 3116 in a fashion which both carries out the apparent purpose of the Legislature and harmonizes this section with § 3135 and the due process and equal protection clauses of the Michigan and United States Constitutions. Accordingly, in light of § 3135, we construe § 3116 to mean that an insurance carrier paying personal injury protection benefits is entitled to reimbursement from the tort recovery of a person injured as a result of a motor vehicle accident only if, and to the extent that, the tort recovery includes damages for losses for which personal injury protection benefits were paid. Thus, since § 3135 abolishes tort remedy for losses covered under the personal injury protection insurance provisions of the act, an injured plaintiff should recover nothing for which the insurance carrier will have a right of reimbursement under § 3116. We believe this interpretation of § 3116 not only gives full effect to § 3135, but it also effectuates the essential purposes of this section, namely, to prevent *double recovery* of economic loss by those persons who retain their right to sue in tort for economic loss under the act.[15]

---

[15] Under the No-Fault Act, such "double recovery" of economic losses might occur with respect to the following persons:

(1) those persons who retain their right to sue for economic losses because they were injured by a motorist *not insured* under the act (see § 3135[2] of the act, which partially abolishes tort liability resulting from accidental motor vehicle injury only as to those persons who have complied with the mandatory security provision of the act, § 3101).

(2) those persons who retain their right to sue for economic losses

Defendant Community Services citing *Pelkey v Elsea Realty & Investment Co,* 394 Mich 485; 232 NW2d 154 (1975), raises the thoughtful and interesting point that under the law of workers' compensation, subtraction from benefits to the extent of total third-party tort recovery minus reasonable expenses and attorney fees is authorized. However, the analogy of the Worker's Disability Compensation Act to the No-Fault Act is not exact and *Pelkey* is not controlling. As plaintiff correctly points out, the tort recovery under the Worker's Disability Compensation Act is for all damages, economic and noneconomic, MCL 418.827; MSA 17.237(827), whereas a § 3135 recovery is only for "noneconomic loss" which by definition excludes all benefits payable under no-fault. This comparison is useful, however, because it does indicate that the Legislature, although by different methods, in both acts provided against double recovery.

Therefore, we hold, on the basis of statutory construction, that § 3116 of the No-Fault Act does not entitle Community Services to subtract plaintiff's tort recovery from the personal injury protection benefits it must pay plaintiff, because plaintiff's tort recovery was made pursuant to § 3135 of the act and included damages for losses for which personal injury protection benefits are not paid.

V. CONCLUSION

For the reasons set out above, we therefore hold (1) that plaintiff was "domiciled in the same house-

because they were injured in another state (see § 3135[2], which partially abolishes tort liability "arising from the ownership, maintenance or use *within* this state" of a motorist who has complied with the mandatory security provision of the act, § 3101).

(3) those persons who suffer intentionally caused harm to their body or property (see § 3135[2][a]).

hold" as her father-in-law and affirm the trial
judge on this issue; (2) that Medicaid benefits are
not subject to a § 3109(1) set-off, affirm on different
grounds the trial judge's order disallowing the set-
off and remand for a disposition of this issue
consistent with this opinion, expressing no opinion
as to the propriety of a § 3109(1) set-off of redun-
dant, accident-related, *ex gratia* governmental
transfer coverage; and (3) that the language of
§ 3116 permitting subtraction from no-fault bene-
fits of tort recoveries must be read in connection
with § 3135 allowing tort recoveries for "noneco-
nomic loss", thereby excluding plaintiff's tort re-
covery of noneconomic loss under § 3135, and,
accordingly affirm the trial judge, but on the basis
of statutory construction rather than unconstitu-
tionality.

Affirmed in part; reversed in part; and re-
manded in part. No costs, a public question being
involved.

FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ.,
concurred with WILLIAMS, J.

LEVIN, J. *(concurring in part and dissenting in
part).* We disagree with the Court on Issue I and
concur in the disposition of Issues II and III.

The first issue concerns § 3114 of the no-fault
motor vehicle liability act,[1] providing that a no-
fault policy is deemed to apply to "the person
named in the policy, his spouse, and a relative of
either domiciled in the same *household"* (emphasis
supplied), with the result that where a relative so
domiciled is not insured, the householder's insurer,
rather than the insurer of the vehicle in the
accident, is obliged to pay no-fault benefits.[2]

---

[1] MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.,* as amended.
[2] See MCL 500.3114(4), 500.3115(1); MSA 24.13114(4), 24.13115(1).

Deborah Workman lived with her husband in a trailer owned by her father-in-law, located on his property 40 to 50 feet from his house. The question is whether the trailer and the house or those there residing constitute a single household so as to require the father-in-law's insurer to pay no-fault benefits to her. We would hold that Workman was not domiciled, within the meaning of the act, in her father-in-law's household and therefore the insurer of the vehicle in which she was a passenger is obliged to pay no-fault benefits to her.

The second issue concerns the application of the set-off provisions of § 3109(1) to Medicaid payments received by Workman. We concur in the Court's decision.

The third issue concerns reimbursement to an insurer for no-fault benefits it has paid out of a third-party tort recovery. Section 3116 originally provided that "after recovery is realized upon a tort claim, a subtraction [from first-party benefits] shall be made to the extent of the recovery * * *. If personal protection insurance benefits have already been received, the claimant shall repay to the insurers out of the recovery a sum equal to the benefits received, but not more than the recovery exclusive of reasonable attorneys' fees and other reasonable expenses incurred in effecting the recovery". Recently, on October 16, 1978, § 3116 was amended to limit reimbursement of the no-fault insurer to situations where the defendant was uninsured, or the accident occurred out of state or the injury was intentionally inflicted.[3] Because it appears that the Legislature intended to clarify the statute, we concur in the Court's conclusion that the insurer is not entitled to reimbursement.

---

[3] 1978 PA 461; see fn 5 for text of § 3116 as amended.

I

Neither Workman nor her husband owned an automobile or had a no-fault policy at the time of the accident. The question is which of three no-fault insurers was required to pay no-fault benefits to her. Wolverine Insurance Company insured her mother (with whom she was temporarily residing); Community Services Insurance Company insured her father-in-law (who owned the trailer and property where she was permanently residing); Detroit Automobile Inter-Insurance Exchange insured her sister (the owner and driver of the automobile in which she was injured).

We all agree that Workman was not domiciled in her mother's household at the time of the accident. She was merely visiting for a week to keep her little sister company.

The circuit court concluded that Workman was a relative domiciled in her father-in-law's household and held that his insurer was responsible for payment of her no-fault benefits. In so holding, the court stressed the freedom of movement between the two houses, the electric and water connections to the main house, and that the trailer was a travel trailer not permanently affixed to the property.

This Court affirms that decision, applying a four-factor test to determine if Workman was domiciled in the same household as her father-in-law.

Workman, a daughter-in-law, is clearly a relative of the insured. She had no permanent residence other than the trailer and intended to continue to live there for an indefinite period. The question, therefore, is not whether she was a "relative" or "domiciled" in the trailer but, rather,

whether the trailer and the house or those there residing constituted a single *household*.

Factors (1) and (4) of the Court's test, "the subjective or declared intent of the person of remaining * * * in the place he contends is his 'domicile' or 'household'", and "the existence of another place of lodging by the person alleging 'residence' or 'domicile' in the household", would be appropriate to a determination of which of several sometime abodes is the *domicile*,[4] but have no bearing on whether the trailer and the house constituted a single *household*.

Also of little assistance is factor (2), "the formality or informality of the relationship between the person and the members of the household", and, as it is stated, factor (3), "whether the place where the person lives is in the same house, within the same curtilage, or upon the same premises". If the senior and junior Workmans lived in a two-family dwelling ("in the same house") or side-by-side in an apartment house ("upon the same premises") and enjoyed a close relationship they would still be members of separate households, notwithstanding an informal relationship, the shared house or premises and curtilage.

In concluding that there was a single household the Court points to several factors: shared mailing address, close relationship, access to facilities, occasional shared meals, and shared grounds. Two families in a two-family or apartment house could have the same relationship, but would not constitute one household.

A number of factors point to the opposite conclusion, and indicate that Workman was not a member of her father-in-law's household. The junior

---

[4] For example, whether Workman's permanent residence was with her mother or her father-in-law.

Workmans had been married for four years and had a child. They had always lived apart from the senior Workmans except for three or four months in 1972, and had been living in a different town for about a year before moving into the trailer. They moved to the trailer to be within walking distance of the son's new job, not to maximize the relationship with the in-laws. The junior Workmans did their own grocery shopping, prepared their own meals (except for an occasional dinner with the parents), had their own bath and toilet facilities, refrigerator and television.

The question then becomes whether the statutory language, "domiciled in the same household", should be construed to include a married son's separate abode simply because he enjoys a close relationship with his parents and has access to their house and draws water and electricity from their house.

We construe this clause in the context in which it is found, a provision of the statute allocating responsibility between insurers, not one creating entitlements. If the question were whether Workman is eligible to recover no-fault benefits there would be a reason—to effectuate the legislative purpose of providing no-fault benefits—to opt for a liberal construction of the word "household" to afford maximum coverage. Here, we decide not whether no-fault benefits are payable at all but which of two insurers will pay them. A liberal construction will not effectuate the purpose to provide benefits, and may distort another legislative purpose.

Sections 3114 and 3115 establish the order in which no-fault insurers are required to pay benefits. An injured person looks first to his own insurer, then to the insurer of a relative in the same

household, then to the insurer of the owner of the vehicle occupied when the accident occurred, and then to the driver's insurer.

Persons who live in the same household with an insured but who are not themselves insured are a little like insureds and a little like those not insured. They stand in a close relationship both to an insured and, by reason of the accident, to a covered vehicle. The Legislature has chosen to treat an uninsured person as a unit with an insured relative provided they are "domiciled in the same household".

Sections 3114 and 3115 appear to be a carefully considered division of responsibility between the insurer of the relative of an uninsured person and the insurer of the vehicle in the accident. A member of the same household looks to the relative's insurer, a member of a different household looks to the vehicle's insurer.

Because the construction placed on the word "household" completely determines liability and the Legislature appears to have had a neutral purpose and to have attempted to draw the line down the middle between the two insurers, we should accord that word as exact a meaning as possible. Doing so will deny no-fault benefits to no one.

Too liberal a construction of "domiciled in the same household" does violence to the statute's allocation of the burden of providing first-party benefits by imposing additional insureds on the householder's insurer.

Insurers should be able to calculate their risks. Knowledge of the approximate number of persons covered by the policies they issue may be crucial in such calculations, and therefore the persons for

whom they are responsible should be readily identifiable.

Because a liberal construction of "household" does potential harm to the system's priorities, and a strict construction does not, we would hold that members of the same household must live in the same dwelling unit. Workman was not a member of her father-in-law's household. We would hold that DAIIE, the insurer of the vehicle, is required to provide Workman with no-fault benefits.

## II

We concur with the Court's disposition of the Medicaid set-off issue.

## III

We are unable to join in Part IV of the Court's opinion because we would not have reached the same result but for the recent amendatory legislation.[5]

---

[5] Section 3116 as amended provides:

"(1) A subtraction from personal protection insurance benefits shall not be made because of the value of a claim in tort based on the same accidental bodily injury.

"(2) *A subtraction from or reimbursement for personal protection insurance benefits paid or payable under this chapter shall be made only if recovery is realized upon a tort claim arising from an accident occurring outside this state, a tort claim brought within this state against the owner or operator of a motor vehicle with respect to which the security required by section 3101(3) and (4) was not in effect, or a tort claim brought within this state based on intentionally caused harm to persons or property, and shall be made only to the extent that the recovery realized by the claimant is for damages for which the claimant has received or would otherwise be entitled to receive personal protection insurance benefits. A subtraction shall be made only to the extent of the recovery, exclusive of reasonable attorneys' fees and other reasonable expenses incurred in effecting the recovery. If personal protection insurance benefits have already been received, the claimant shall repay to the insurers out of the recovery a sum equal to the benefits received, but not more than the recovery exclusive of reasonable attorneys' fees and other reasonable*

The Court concludes, independently of the recent amendment, that § 3116 as originally enacted had the meaning given it by the amendment and therefore the no-fault insurer is not entitled to reimbursement from the tort settlement.

The original language of § 3116 was unconditional: " * * * after recovery is realized upon a tort claim, a subtraction shall be made to the extent of the recovery * * * ".

There is no indication in § 3116 as enacted that it was to apply only in cases of double recovery. Many were struck by the seeming unfairness of the provision, but that perception does not authorize a court to rewrite it in the Legislature's name. While the Court's arguments are plausible, they seem to us to assume too much—that the sole purpose of reimbursement is to prevent double recovery—and to ignore other possible purposes. There are other ways in which unconditional reimbursement would further the goals of the no-fault system: there would be less litigation because an

---

*expenses incurred in effecting the recovery. The insurer shall have a lien on the recovery to this extent. A recovery by an injured person or his or her estate for loss suffered by the person shall not be subtracted in calculating benefits due a dependent after the death and a recovery by a dependent for loss suffered by the dependent after the death shall not be subtracted in calculating benefits due the injured person.*

"(3) A personal protection insurer with a right of reimbursement under subsection (1), if suffering loss from inability to collect reimbursement out of a payment received by a claimant upon a tort claim is entitled to indemnity from a person who, with notice of the insurer's interest, made *the* payment to the claimant without making the claimant and the insurer joint payees as their interests may appear or without obtaining the insurer's consent to a different method of payment.

"(4) *A subtraction or reimbursement shall not be due the claimant's insurer from that portion of any recovery to the extent that recovery is realized for noneconomic loss as provided in section 3135(1) and (2)(b) or for allowable expenses, work loss, and survivor's loss as defined in sections 3107 to 3110 in excess of the amount recovered by the claimant from his or her insurer."* MCL 500.3116; MSA 24.13116 (emphasis supplied to show amendatory language of 1978 PA 461).

injured person would have to anticipate a tort recovery large enough to pay attorneys' fees and reimburse the no-fault insurer and still yield a net recovery sufficient to make the effort worthwhile; less litigation would mean less of the premium dollar would be expended on attorneys' fees and litigation costs and more would be available to pay insurance benefits to injured persons; court congestion should be relieved; the cost of insurance should be reduced as money is plowed back into the system through reimbursement.[6]

These alternative rationales prevent us from saying that a statute requiring reimbursement whether or not the recovery is duplicative is unconstitutional or that the Legislature originally must have intended that reimbursement be required only where there is duplicative recovery.[7]

1978 PA 461 has become law, and it is necessary to reconsider Workman's claim in its light.

The no-fault act was passed six years ago and the meaning and constitutionality of § 3116 have been in dispute ever since.[8]

---

[6] Since net payouts would be reduced it should be possible to reduce premiums and hence the cost of insurance.

[7] See *Shavers v Attorney General,* 402 Mich 554, 620; 267 NW2d 72 (1978). *Cf. Easom v Farmers Ins Co,* 221 Kan 415; 560 P2d 117 (1977) (the legislature there also subsequently amended the statute). See, also, Hawaii Rev Stat (1977 Supp), § 294-7 providing for subrogation of the no-fault insurer to the extent of 50% of the no-fault benefits paid.

[8] In *Shavers v Attorney General, supra,* the circuit judge declared that "§ 3116 of the act is construed to require subtraction from personal protection insurance benefits paid or payable under the act only when like benefits have been recovered upon tort claims". The Court of Appeals and this Court held that a declaratory judgment on this issue was inappropriate as the plaintiffs in that case did not show that decision on this issue was necessary to guide their future conduct.

In *Murray v Ferris,* 74 Mich App 91; 253 NW2d 365 (1977), the Court of Appeals construed § 3116 to provide for unconditional reimbursement and declared the section violative of the Equal Protection and Due Process Clauses as it deprived victims of serious accidents of an opportunity to be made whole for their damages.

While this litigation was pending and the insurance industry and consumers were awaiting our construction of the section, the Legislature spoke to the issue, apparently in response to the uncertainty regarding its proper construction and validity.

Whether legislation is to be applied retroactively depends on legislative intent.[9] An enactment need not be made explicitly retroactive; legislative intent may be evidenced in other ways. When amendments are passed in the midst of controversy over a provision's meaning, the usual presumption that an amendatory act declares new law is overcome and a legislative intent to clarify rather than to change the law may be inferred.[10]

This principle was accepted by this Court in *Detroit Edison Co v Dep't of Revenue,* 320 Mich 506, 520; 31 NW2d 809 (1948), where an amendment to a taxing statute, passed after the tax years in question, resolved a dispute concerning the construction of the statute between the Department of Revenue and the State Board of Tax Appeals.[11]

---

In the instant case, the circuit court also found § 3116 unconstitutional to the extent it required reimbursement out of plaintiff's tort settlement.

[9] "The question whether a statute operates retrospectively, or prospectively only, is one of legislative intent. * * *

"The rule that statutes or amendments are to be given a prospective operation merely, like all other rules of interpretation, is only resorted to in order to give effect to the presumed and reasonably probable intention of the legislature * * * ." 73 Am Jur 2d, Statutes, §§ 350-351, pp 487-488.

[10] See 82 CJS, Statutes, § 384, p 906; *Union League Club v Johnson,* 18 Cal 2d 275, 279; 115 P2d 425, 426 (1941).

[11] This Court said:

"In 1 Sutherland Statutory Construction (3d ed, 1943), p 418, § 1931, it is said:

" 'If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act—a formal change—rebutting the presumption of substantial change.'

* * *

The amendment to § 3116 began as House Bill 5925. An analysis of that bill states that its purpose was clarification.[12] While the analysis represents the view of the Department of Commerce and does not emanate from the Legislature itself, it is part of the legislative history and lends support to the view that the amendment was intended to clarify the meaning of § 3116.

In the instant case, we are satisfied from the circumstances attendant on the amendment's passage that the Legislature intended its new version of § 3116 to control cases arising both before and after its enactment.

Because it now appears that the Legislature intends that § 3116 require reimbursement out of a third-party tort recovery only where the defendant is uninsured, the accident occurs out of state,

"In view of the factual situation existing at the time of the amendment it is a logical conclusion that the primary purpose of the legislature was * * * to clarify the statute because of the differences of opinion." *Detroit Edison Co v Dep't of Revenue,* 320 Mich 506, 521-522; 31 NW2d 809 (1948).

The United States Supreme Court has said:

"After controversies had arisen as to the interpretation to be given to the statute, upon the question in issue in this case, * * * Congress passed the act of 1872 * * * . This enactment was evidently intended to remove any doubt previously existing as to the meaning of the statute and declare its true construction and meaning. Had it been intended to apply only to cases subsequently arising it would undoubtedly have so provided in terms." *Bailey v Clark,* 88 US (21 Wall) 284, 288; 22 L Ed 651 (1875).

[12] "Section 3116 is amended to make clear that the insured must reimburse the insurer for personal protection insurance benefits received only if the insured has realized recovery upon a tort claim for like benefits."

The analysis further explains:

"The intent behind this section is to prevent double recovery by a victim of both personal injury protection benefits and tort recovery for the same economic losses, but the current language fails to achieve this. * * * The language in this bill makes clear that the insured is required to reimburse his insurer only when the recovery in a tort suit is for like benefits to those already received from the insurer."

or the injury was intentionally inflicted, we concur in the Court's result on this issue.

KAVANAGH, C.J., concurred with LEVIN, J.

COLEMAN, J. *(concurring in part, dissenting in part).* I agree with part I of Justice LEVIN's opinion and with parts III and IV of Justice WILLIAMS' opinion.